IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA :
:
v. : Case No. 1:10CR313-01
:
JOSHUA B. NABATKHORIAN :
:
Defendant :

## POSITION OF DEFENDANT, JOSHUA B. NABATKHORIAN, WITH RESPECT TO SENTENCING FACTORS

The Defendant, Joshua B. Nabatkhorian, by counsel, submits the following with regard to the sentencing.

### INTRODUCTION

Joshua Nabatkhorian is before the Court for sentencing on his guilty plea to a single count of Attempted Enticement of a Minor in Interstate and Foreign Commerce in violation of Title 18 USC § 2422(a). Mr. Nabatkhorian has cooperated fully with United States Probation Officer Karen Moran in the preparation of the Pre-Sentence Report and has fully and completely accepted responsibility for his actions. At sentencing on February 25, 2011, Mr. Nabatkhorian will speak to the Court directly to acknowledge the harm he has caused, express his remorse, and accept his just punishment.

The Pre-Sentence Report is comprehensive and describes Mr. Nabatkhorian's background, family circumstances, employment history and lack of significant prior criminal history. This pleading will expand on the matters reported there and place aspects of the offense and Mr. Nabatkhorian's personal history in context. Expert reports related to Mr. Nabatkhorian's mental health and offense conduct as well as letters of support are attached which provide futher context. These documents and the PSR make clear Mr. Nabatkhorian's

substance within his family and the community, and predict his success in the future despite the sentence he will serve, despite sex offender registration requirements, despite supervised release restrictions, and despite his status as a felon with a serious sex offense conviction.

The sentencing agreement in this case is unusual. The parties agree in the plea agreement that the appropriate sentencing guidelines range is 57 to 71 months, given a three level reduction for acceptance of responsibility. (See plea agreement Paragraph 4, pages 3-4). Pursuant to the agreement the government can request the Court to impose any sentence felt to be appropriate without regard to the guidelines calculation. However, Mr. Nabatkhorian is bound by the agreement not to seek a sentence of less than 57 months no matter Mr. Nabatkhorian's personal history, mental health circumstances and all other relevant considerations pursuant to Title 18 U.S.C. section 3553(a). The circumstances of this case demand punishment, and the sentence imposed should be one which cautions others. Nevertheless, while abiding by our promise not to argue for a sentence below 57 months, the court's sentencing calculus rightly should take account of Mr. Nanatkhorian's history and mental health issues.

Whatever the sentence, we request the Court recommend to the Bureau of Prisons that the sentence be served at FCI Petersburg, the closest facility to Mr. Nabatkhorian's family, and also that Mr. Nabatkhorian be allowed to self-surrender.[1]

## FACTUAL BACKGROUND

While that Pre-Sentence Report and Statement of Facts are accurate, it is important to make clear what occurred beyond the facts proffered by the government.

---

[1] While Mr. Nabatkhorian knows he must be prepared to begin his sentence, the Bar Mitzvah of his son Jonathan is scheduled for mid May, 2011. While attendance at this important event is very important to Mr. Nabatkhorian, it is even more so to his son and family. It is therefore requested that self surrender be delayed until the week after the Bar Mitzvah celebration, for the benefit of Jonathan and the rest of the family.

Like many others, Mr. Nabatkhorian used cell phones and computers in his work and for other lawful purposes. The computer basically became a communication tool for Mr. Nabatkhorian. He was hardly a sophisticated user, generally using the machine for work-related accounting, email, viewing news reports, and religious and community research. Like most in his generation those skills were learned over time and in somewhat haphazard fashion versus the younger generation for whom the computer and instant communication has developed into a way of life. But over time. Mr. Nabatkhorian used the computer on an increasing basis for non-business purposes.

In stark contrast to other cases the Court has seen, however, Mr. Nabatkhorian never ventured into the underbelly of the Internet by seeking out or viewing pornography of any kind, by participating in sexually explicit adult chat rooms, or other similar activities. Law enforcement, both state and federal, undertook full forensic evaluations of Mr. Nabatkhorian's computers and related media, at home and work, and did not find a single image, chat, solicitation, or other usage of the computer for sexual purposes whether legal or not.

Mr. Nabatkhorian did become became familiar with, and virtually obsessed with, the text and instant message functions of his cell phone. He sent hundreds and hundreds of texts, some meaningful and serious, but many silly and nonsensical. His constant texting soon annoyed his entire family. Still, these messages related to family, work, social and community events, and the religious community. Mr. Nabatkhorian sent jokes and messages of the day, and often referred to himself as "Master" or "King Joshua".[2]

Until his messaging with RS, Mr. Nabatkhorian had never acted in the manner yielding

---

[2] Documents predating computer usage and going back almost 20 years confirm such "Master" and "King" references by the defendant, including correspondence with his wife and other family members. They can be provided to the Court for confirmation.

the charges here. That is not just the proffer of defense counsel, but rather the finding of law enforcement. Eventually though, through the world of cell phone texting, Mr. Nabatkhorian's messages moved from perhaps odd and disjointed messages which annoyed his family, to inappropriate, and then to criminal, all in the course of several days. The line between acceptable and illegal became blurred and then non-existent. Elsewhere in this position paper what was going on with Mr. Nabatkhorian and how he lost his self discipline will be discussed. Suffice it to say at this point that during a very limited period Mr. Nabatkhorian engaged in wrongful and then criminal chat, illegal communication and solicitation. He not only lost his way, but caused huge damage to a child, her family, his own wife and children and his community. The excitement, titillation, and fantasy have brought down a man otherwise committed to being and doing good.

With that said, Joshua Nabatkhorian is humiliated at what he did. He finds his actions unspeakable, particularly since they were directed toward someone about whom he cared greatly. Mr. Nabhatkhorian has been and continues to work hard at identifying, understanding and dealing with what lead him to acting out on some spark of attraction for RS. The conduct was simply wrong and unacceptable and for that Mr. Nabatkhorian is before this Court having fully accepted responsibility for what he has done. The activity was part of a downward spiral which has ruined his life, and harmed both the victim, as well as his family.

## THE PROCEDURAL HISTORY AND PLEA AGREEMENT

The procedural history in this case is somewhat unusual. Mr. Nabhatkhorian was arrested on November 17, 2009 by the Fairfax County Police and charged with Use of a Computer to Solicit a Child Under the age of 15 (Code of Virginia Section 18.2-374.3), and Indecent Liberties with a Child under the age of 15 (Code of Virginia Section 18.2-370). Bond

was denied and Mr. Nabatkhorian was held for several days until the court allowed conditions of release. The case was set for preliminary hearing in February 2010, but was continued by the Commonwealth until June 7, 2010. During the entirety of that time Mr. Nabatkhorian was under close court supervision through the state Supervised Release Program. There were no problems or violations. The afternoon before the June 7, 2010 preliminary hearing counsel was advised that the state charges were going to be *nolle prossed* and that the federal authorities would be prosecuting this matter. Despite his full cooperation for months, Mr. Nabatkhorian, who was at the bus stop dropping his daughter, was arrested down by numerous Fairfax Police and FBI agents the morning of court. The arrest, which can only be described as a "take down", was conducted with full "jump out" and SWAT teams on a day Mr. Nabhatkhorian was due in court a few miles from his house in just two hours.

At the detention hearing on the federal complaint the Fairfax County Detective acknowledged that the charges were being prosecuted federally so Mr. Nabatkhorian would receive a longer sentence, despite the fact the state offenses were serious felonies with a five year minimum mandatory sentence and sex offender registration. In other words, the federal charge carried a ten year minimum mandatory sentence and that is what the Detective wanted. Eventually Mr. Nabhatkhorian was placed on Supervised Release with electronic monitoring. His cooperation has been complete. Mr. Nabatkhorian has lived apart from his family, in an Alexandria apartment, under mandated adult supervision throughout these proceedings.

As the Court will recall from the motions filed herein, the government controlled the litigation with the ten year minimum mandatory sentence based upon the original charge at arrest and indictment. Through open and regular communication between counsel for the government and Mr. Nabatkhorian, the parties were able to come to a consensus with the amendment to a

serious charge, but one which does not have a minimum mandatory sentence. The sex offender registration is still a requirement of this conviction. Immediately upon the government's agreement to allow a plea to the instant offense, Mr. Nabhatkhorian entered his guilty plea for which he is now to be sentenced.

From the outset, the government, defense counsel and Mr. Nabatkhorian cooperated in discussing and fashioning a disposition in this difficult matter. The prosecution met with defense counsel and gave consideration to the defense positions and arguments on Mr. Nabatkhorian's behalf. Likewise, Mr. Nabatkhorian and his counsel gave full consideration to the government's evidence of serious conduct and the harm to RS and her family. All the while, Mr. Nabatkhorian worked in therapy to understand why he had crossed the line of self discipline. Mr. Nabatkhorian has, during the 15 months since his arrest, complied with every condition of release and supervision. While pre-trial release has been a privilege, there is no question that such a lengthy period of supervision with electronic monitoring is more than nominal supervision, and has a punishing and stressful impact.

By his guilty plea Mr. Nabatkhorian is a felon who will be sentenced to prison, as a sex offender who victimized a minor, incarcerated in an unknown location away from his family, and required to register as a sex offender for all of the community to know. From his plea, no one can suggest Mr. Nabatkhorian has not already been and will not continue to be punished.

## THE PRESENTENCE REPORT

The presentence report accurately outlines Mr. Nabatkhorian's offense conduct and life history and relationships. The sentencing guidelines are accurately calculated and are consistent with the anticipated range agreed upon by the parties in the plea agreement. Mr. Nabatkhorian has absolutely no significant criminal record and has been married since 1992 to Nathalie

Nabatkhorian. They have four delightful children ages 17, 14, 12 and 8 and have lived in the same community for years. All family members are well known and respected for being positive and contributing members of their local, religious and school communities. Mr. Nabatkhorian and his family own a stable business well known in the Alexandria community and beyond. The life history shown in the PSR is of a person who works hard, tries to meet his commitments to his family, business, community and religion. Stated simply, from someone on the outside looking in, Mr. Nabatkhorian had it all.

However, the PSR reveals trouble in this man's world, not related to infidelity or sexual acting out, but with wild mood and activity swings, horrible decision making and fanatic interactions. Under the veneer, Mr. Nabatkhorian, was depressed, anxious, and acted on impulse regarding his religion, charity and business by spending and doing for others well beyond his means. At times there was simply no rhyme or reason to what he was doing. All of this added to stress culminating in the 2009 time frame when he discovered significant losses in his business at the hands of those he trusted. This meant lawyers, litigation, and more stress, including significant financial problems. Mr. Nabatkhorian was slipping into a dark place on a personal level while leading the world to believe he was just fine. In fact he was not.

Now, with the diagnosis of bi-polar II and other mental health diagnosis', proper therapeutic plans have been set in place, medication has been prescribed and Mr. Nabatkhorian can now see how truly bizarre many of his decisions were over the years, long before the instant conduct.

Proper and constant therapy has been undertaken for months with a sex offender-certified and experienced psychologist, with full medication oversight by psychiatrists. The changes in Mr. Nabatkhorian's manner, appearance, decision making process, and outlook for the future are

evident to all. As serious and devastating as this prosecution process has been, the rehabilitative and personal benefits have already begun to take hold.

## ACCEPTANCE OF RESPONSIBILITY

Joshua Nabatkhorian has clearly demonstrated his acceptance of responsibility and remorse for his actions. By his words to the Court at his plea, the signing of the Statement of Facts, and interaction with Probation Officer Karen Moran that is clear. Ms. Moran spent an extended period of time with both Mr. and Mrs. Nabatkhorian who answered every question, and beyond that opened their hearts about the impact Mr. Nabatkhorian caused RS. Through therapeutic efforts in which this inexplicable conduct has been acknowledged, studied and treated, Mr. Nabatkhorian has fully admitted his conduct and accepted responsibility without blame to others or ill will toward the "system." Therefore, a total three (3) offense level reduction for that reason is appropriate by the probation officer's calculation.[3]

## MENTAL HEALTH STATUS

As the Court is aware, Joshua Nabatkhorian has participated fully in significant mental health evaluations and treatment since shortly after his release on bail. The process began with an evaluation for diagnosis and treatment recommendations by Ronald Boggio, PhD (see attached report at Tab 1) and the prompt initiation of treatment by Mark Binderman, Ph.D., a forensic and clinical psychologist who is sex offender-certified in the Commonwealth of Virginia and who has handled numerous sex offenders for treatment purposes. Additionally, from an evaluative point of view and to assure Mr. Nabatkhorian was in the proper therapeutic programs, Mr. Nabatkhorian was evaluated at Johns Hopkins by Dr. Schmidt, a clinical and forensic

---

[3] As indicated previously, the third point for acceptance of responsibility is anticipated to be requested by the government under the plea agreement. However, the government has yet to make that motion.

8

psychiatrist who works at and with the John's Hopkins University. Dr. Schmidt saw Mr. Nabatkhorian and his wife on the occasions necessary to make a full evaluation and has made various diagnosis, most importantly that Mr. Nabatkhorian suffers from Bi-Polar II disorder which helps to explain his variable and difficult behavior, not only in this case but otherwise in his life as well.

Mental health treatment in this case is key to the rehabilitation process. Mr. Nabatkhorian has long suffered, without diagnosis or treatment, from mental health problems. Treatment has been a point of solace and growth over these many months for Mr. Nabatkhorian who has grown in the understanding of what he has done. He continues to gain insight into why and how he let himself get into these circumstances, and the victimization of RS and her family. The good news is that Mr. Nabatkhorian, contrary to others who go through therapy for the system's sake, has embraced treatment and done well which predicts he will continue to do so in the future. There has also been great benefit to the marital relationship between Joshua and Nathalie Nabatkhorian who continue to work hard and successfully in addressing couples issues, whether related to the offense conduct or otherwise.

## UNITED STATES V. BOOKER

As the Court is aware, the sentencing guidelines are merely advisory. United States v. Booker, 540 3U. S. 220, (2005). The Court is free to set a sentence based upon an analysis of the factors set forth in title 18 U. S. C. Section 3553 (A), including the nature of the circumstances of the offense, and the history and characteristics of the defendant; and the need for the sentence imposed, (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, (2) to afford adequate deterrence to criminal conduct, (3) to protect the public from further crimes of the defendant, and (4) to provide the defendant with

needed treatment. The statute itself instructs the District Court to "impose a sentence sufficient, but not greater than necessary to comply with" these goals of sentencing. In this case, given the terms of the plea agreement, these factors are still of importance to the Court's ultimate decision in what is anticipated to be the governments request at or even above the high end of the guidelines range of 71 months

The Supreme Court gave additional guidance on the sentencing process in Gall v. United States, 552 U.S. 38 (2007). That case makes clear that after calculating the guidelines range the sentencing court must give the defendant and the government "an opportunity to argue for whatever sentence they deem appropriate." Gall, 552 U.S. at 49-50. The court should then consider all the section 3553(A) factors, and should then fashion a sentence in light of them. In so doing, the court must not presume that the guideline range is reasonable. Id.

The Supreme Court has put an exclamation point on the status of the sentencing guidelines making clear that the District Court must not presume the guidelines range is reasonable. In reversing the Fourth Circuit for the second time for applying a presumption of reasonableness to the guidelines at sentencing, the Court ruled, "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Nelson v. United States, 555 U.S. 3 (2009) Therefore, as the Court stated in Gall, at sentencing this Court "may not presume the guideline range is reasonable." *Id.*

Recent decisions from the Fourth Circuit and elsewhere show just how willing the courts are to devise a reasonable sentence which is nevertheless well below the guidelines when the facts demanded.

A good example is United States v. McClellen Walther, No. PJM-06-0397 (District of Maryland, April 3, 2007). Walther pleaded guilty to possession of child pornography under 18

10

U.S.C. Section 2252(a)(4)(B), though in its sentencing position paper, the government asserted that he could have been charged with receipt of child pornography. The facts supporting Walther's plea were quite different from the facts in Mr. Nabatkhorian's case. Walther, using the Internet, responded to an undercover advertisement posted by the U.S. Postal Service and U.S. Immigration and Customs Enforcement offering videos. After receiving a catalog, and after e-mail correspondence in which Walther specifically sought "hard core pre-teen" videos, Walther was given a coded password which he used to place an order for seven such videos through the Internet. Those videos had been described in vivid terms in the catalog and contained explicit sexual acts including anal and oral sex with numerous children as young as seven. It was agreed in the Plea Agreement that some of the material was sadistic in nature. It was also agreed that the defendant possessed over 600 images of child pornography. Not mentioned in the Statement of Facts but included in the Government's Sentencing Memorandum was the fact that Walther's computer and external media contained 3,701 images of child pornography. While a number of them had been deleted, 2,320 such images had been saved.

The parties in Walther agreed that the sentencing guidelines called for a sentence within the range of 78-97 months, and the government urged the court to impose a sentence within that range. The defendant, however, argued that his years of good work as a pediatric cancer surgeon combined with the community service he performed post-arrest while on bond merited a sentence well below the guidelines. The Court agreed, imposing a sentence of 48 months, a sentence 37% and 5 levels below the guideline range. The government did not appeal.

The Fourth Circuit has shown an unwillingness to second guess a district court's decision to sentence well below the guidelines in child pornography cases. In <u>United States v. Pauley</u>, 511 F.3d 468 (4th Cir. 2007), for example, the government appealed a sentence of 42 months in a case

in which Pauley was charged with possession of child pornography. Pauley was a Junior High School teacher who had been approached by an eighth grade student who offered to sell him naked photographs of her. Pauley purchased the photos. This happened twice more. Then, the student offered to sell Pauley photographs of her having sex with another female student. Pauley agreed, and provided her with a camera. He was later arrested and charged with possession of the pornographic photos. Pauley's sentencing guidelines included enhancements for causing a minor to engage in sexually explicit conduct, for the involvement of a victim under the age of 16, and for involvement of a victim under Pauley's supervision as a teacher.

After deducting points for acceptance of responsibility, Pauley's guidelines came to 78-97 months. The district court, however, eventually varied from the guidelines and imposed a sentence of 42 months, based on the fact that (1), Pauly had been approached by the victim, (2), fewer than 24 photos were taken, (3), the victim's face did not appear in the photos, (4), Pauley displayed deep remorse, (5), Pauly had been a model citizen and a good father, (6), as a result of the conviction, Pauly lost his teaching certificate and his state pension, (7), Pauly agreed to a lifetime of supervised release, (8), no other child pornography was found in his house, and (9), the counseling he would receive while incarcerated would rehabilitate him.

On appeal, and after reviewing the law in light of Gall, the Fourth Circuit found that "the district court's rationale for varying downward thirty-six months from the low-end of Pauley's Guideline range is reasonable and premised on the factors set forth in Section 3553(a)," identifying each of the factors the district court relied on as completely proper. The Court rejected the government's arguments that the district court placed excessive weight was on a single factor, and noted that even if it did, such was permissible under Gall. The Court also

rejected the notion that a substantial variance from the Guidelines must be justified by extraordinary circumstances. 511 F.3d at 475.

Finally, in the case of United States v. David Kaye, 451 Supp.2d 775 (E.D. Va. 2006), even with interstate travel for sex with a minor, and an obstruction enhancement, a sentence of 78 months was imposed, after trial. This was out of the so called "Perverted Justice, To Catch A Predator" series on NBC and included outrageous allegations, yet the sentence imposed for a man who traveled to Herndon, Virginia, from Maryland allegedly to have sex with a 13 year old boy, was at the low end of the guidelines, even after an obstruction enhancement. Another man charged out of the same investigation, on the same charges of actually traveling to sexually abuse a child, received a 60 month sentence.

With this as predicate, counsel now turns to the key issue, which is how the Court should apply its authority to craft a sentence for Mr. Nabatkhorian which is "sufficient, but not greater than necessary to comply with," the statutory goals of sentencing. With that in mind, the factors in Section 3553(a) are set out.

### NATURE AND CHARACTER OF THE OFFENSE, THE NEED FOR SENTENCE TO REFLECT THE SERIOUSNESS OF THE CRIME, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT

By any definition, a sentence of almost five years of incarceration is a heavy penalty and therefore, promotes respect for the law and provides just punishment. Mr. Nabatkhorian has already and will forever be punished far beyond incarceration for the victimization of RS, but also for what he has done to his family and the many who believe so strongly in him. Beyond the immediate impact of incarceration, as the Court will see from the attached letters of support, and other information provided, Mr. Nabatkhorian has been deeply committed to his children, their upbringing and being their provider. Every day of incarceration is a day of separation from

them. What he will miss as they grow into their teenage and college years will never be regained. The guidance, love and support he can provide to his kids will be forever lost. For an uncaring person, incarceration may be simply doing time and getting it over with. For Mr. Nabatkhorian it is certain he will every day suffer for, not only what he has done to RS, but also to his own children.

Mr. Nabatkhorian will additionally suffer, knowing that he is leaving his wife Nathalie to shoulder the burden of raising their children, moving to another home, trying to manage finances without a breadwinner, and the loneliness that afflicts the spouse of one incarcerated. For all of this Mr. Nabatkhorian will also be punished.

Incarceration is difficult, no doubt, and is intended to be so. For caring people the fact of being imprisoned is devastating, but survivable. However, the loss of freedom: the freedom to be with your children, support your wife, and to be productive is not. With certainty Joshua Nabatkhorian by public humiliation, uncertainty, and stress has already been punished. Any period of incarceration will surely reflect the seriousness of the offense, promote respect for the law, and ensure just punishment.

## NEED FOR SENTENCE TO PROMOTE SPECIFIC AND GENERAL DETRERRENCE

At times, those so regularly involved in the criminal justice system become somewhat desensitized to sentencing events. For this man, never before in such a situation, a prison sentence of years is an eternity. Additionally, significant publicity surrounding this prosecution at the time of arrest brought scorn and humiliation upon Mr. Nabatkhorian. Few have their problems made so public as has occurred in this case. Because of Mr. Nabatkhorian's profile within his community and the media coverage of this case, there was a huge amount of television, radio, newspaper and internet attention heaped upon Mr. Nabatkhorian and his family.

Mr. Nabatkhorian and his wife and children will serve the ongoing punishment of the sex offender registration required by law. The impact of sex offender registration on an offender and his family cannot be overstated. The rules are daunting, and the State Police web site for sex offenders is always there. Joshua Nabatkhorian, no matter the good he does in the future, to the public at large will be someone to be scorned and avoided: a sex offender. Beyond his sentence to be served and period of supervised release Mr. Nabatkhorina will always have that.

An appropriate sentence, lengthy period of supervised release, treatment as needed, and sex offender registration are more than sufficient punishment to deter Mr. Nabatkhorian from re-offending and provide more than ample disincentive for others who might contemplate engaging in similar conduct.

## NEED FOR THE SENTENCE TO PROTECT THE PUBLIC

Mr. Nabatkhorian has proven that he is not a danger to the public by his entry into therapy which shows he is amenable to treatment and will be successful. There is also every indication Mr. Nabatkhorian will be able to follow the conditions of supervised release. The search warrant in this case was served and Mr. Nabatkhorian was arrested on November 17, 2009. Since then, Mr. Nabatkhorian has known the likelihood of conviction and sanction. He has been highly successful on pre-trial supervision in the state and federal courts and on electronic monitoring.

The support letters filed herewith make clear there is a group of those who have and will continue to help Mr. Nabatkhorian upon his release from prison. Those who have written are family, friends and professionals who have known Mr. Nabatkhorian in every phase of life. The letters are remarkable by their content. The authors have seen the unvarnished version of Joshua Nabatkhorian since his arrest and remain there for him, which speaks volumes about the man

before the Court. Supervised release conditions will be daunting, as will be the sex offender registration requirement, all imposed to protect the public. The past 15 months have proven Mr. Nabatkhorian can and will abide by the norms and expectations of the Court and community.

Counsel would be remiss by not addressing Mr. Nabatkhorian's connections with youth and school activities with and for his own children and others for many years. Mr. Nabatkhorian estimates that he has been around and been supportive of literally hundreds of teenagers over many years. He has also officiated in many school, synagogue and community activities that focus on children. When no one else would do so, Mr. Nabatkhorian was the one who was there for the community, and in particular the needy and the children. Never had there been a complaint of inappropriate contact, conduct, language, or suggestion of seduction attributed to this man who has contributed literally thousands and thousands of hours to these activities so beneficial to the community until his failure in this case. The support letters make this clear. The quantity of the writings is not important, but the quality of what has been said is the point. Joshua Nabatkhorian, with all he has done that is wrong, has done a great deal that is right and good.

## NEED TO PROVIDE TREATMENT AND EDUCATION

The defendant needs treatment for his mental illness which is offense-specific and beyond that with which he has been afflicted for many years. For this he has been receiving treatment since his arrest. A sentence of incarceration will provide the opportunity to the extent it exists for treatment within the Bureau of Prisons. However, all within this process know the provision of treatment while incarcerated is minimal at best. Beyond that, and given the likelihood that treatment of a substantive nature will not be given, imprisonment will likely

impede, rather than promote recovery. A longer sentence the government seeks is not needed to advance this sentencing goal.

## JOSHUA NABATKHORIAN - THE PERSON

All of the legalities, statute and case authorities, references to acceptance of responsibility aside, the Court is asked not to weigh the conduct herein against Mr. Nabatkhorian's history, but rather to see and consider the full circumstances. The victim impact statement submitted by RS is chilling. Fortunately she was shielded by the exchanges with the police detective, and the language and suggestions of what might take place. However, what RS received was enough, and the impact on her is real, not imaged. That said, Mr. Nabatkhorian cannot undo what has been done, and hopes and demands to all who know of this terrible affair that RS did nothing wrong. For anyone to suggest otherwise is what is wrong.

While no mention has been made of restitution, assuming RS has been in therapy attributable to this case, Mr. Nabatkhorian feels it is his obligation to reimburse such expenses. Whether they have occurred in the past or come about in the future, he has the responsibility to assure RS has the help she needs and commits to the payment of such costs, whether as restitution or a term of supervised release.

Mr. Nabatkhorian has also reflected on what he has done, and how he can help others upon his release. To that end he has moved forward, on his own, and without the suggestion of counsel, on seeking input on how to help others avoid his mistakes, and to help those who have been victims of such conduct.

A final point for consideration is to note that efforts to be part of the community without acknowledgment or recognition have been part of Mr. Nabatkhorian's life. Without the knowledge of others, and likely against the interest of his family, Mr. Nabatkhorian donated

during recent years almost $300,000.00 to many community and religious organizations. Whether sensible or not to do so, that is what he did, in order to help others. (See Tab 2 showing tax and contribution records)

Additionally, Mr. Nabatkhorian has received many commendations and praise from community organizations, school and the community as a whole.

This is a man, no matter if he should have been putting his energy elsewhere for his own benefit or not, who has always been there for others in need. The devastation of his actions cannot be overstated. This is a serious case, but the life this man has led, the contributions he has made, and the efforts he has undertaken to make the lives of others better should not be slighted or set aside. The appended letters and support materials are submitted from people of every walk of life, poor and wealthy, educated and not, successful and modest, of various religions, races and ethnic origin. They all know that Joshua Nabatkhorian has committed serious and wrongful criminal conduct, and they have all written to the Court they are there for him and his family. For that Mr. Nabatkhorian should gain strength and the Court assurance that he will do well upon his release.

## CONCLUSION

Joshua Nabatkhorian is before the Court for imposition of sentence for a violation against and unwitting and innocent minor child. RS was well known to Mr. Nabatkhorian and his family. The breach of trust is unquestioned. Description of the wrongfulness of the act is not needed as the simple name of the offense suggests dramatically the reason this matter is taken so seriously. For many months now, Joshua Nabatkhorian has lived with the knowledge that he

will be serving a prison sentence. His case has been public and the impact on Mr. Nabatkhorian has been significant. He has taken steps to overcome the psychological and emotional problems that led to his illegal behavior and today is a better person for it.

The Court will no doubt impose a sentence of years in prison. No useful purpose would be served by an extreme sentence. At his age, with a lack of prior record and experience in prison, separation from his family, mental health status, the sentence will be no less than devastating. Mr. Nabatkhorian does not assert that a sentence is not deserved. This man has done wrong, admitted his wrongdoing, worked extremely hard at rehabilitation efforts and acknowledged the victimization of RS and those close to her.

It is respectfully hoped the Court will fashion a sentence acknowledging the seriousness of the offense but also the dedication to his family and community with which Joshua Nabatkhorian has lived his life.

Respectfully Submitted,<br>
Joshua A. Nabatkhorian<br>
By Counsel

GREENSPUN, SHAPIRO, DAVIS & LEARY, P.C.

BY: __/s/_____
   Peter D. Greenspun
   State Bar I.D. #18052
   3955 Chain Bridge Road
   Second Floor
   Fairfax, Virginia 22030
   (703) 352-0100
   Email: pdg@greenspunlaw.com
   Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of February, 2011, I will electronically file the foregoing with the Clerk of the Court using CM/ECF, which will then send a notification of such filing (NEF) to the following:

John Eisinger
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
John.Eisinger@usdoj.gov

_____/s/_____
Peter D. Greenspun
Counsel for the Defendant
Greenspun, Shapiro, Davis and Leary
3955 Chain Bridge Road
Second Floor
Fairfax, Virginia 22030
(703) 352-0100
Fax: (703) 591-7268
Email: pdg@greenspunlaw.com